JENNIFER BROWN and IAN BROWN, Plaintiffs Below, Appellants,
v.
JUDY STELLINI, Defendant Below, Appellee.
No. 31, 2009.
Supreme Court of Delaware.
Submitted: May 6, 2009.
Decided: May 21, 2009.
Before HOLLAND, BERGER and JACOBS, Justices.

ORDER
JACK B. JACOBS, Justice.
This 21st day of May 2009, upon consideration of the briefs of the parties and the record in this case, it appears to the Court that:
1. Jennifer and Ian Brown, the plaintiffs below,[1] appeal from a Superior Court order admitting into evidence causation testimony from the defendant's medical expert witness. We find no abuse of discretion and affirm.
2. On May 1, 2006, Jennifer Brown, while driving her car, was "rear-ended" by defendant Judy Stellini. Shortly thereafter, Brown was treated by Dr. Jane Williams, her family physician, who recommended that Brown put ice on her injuries, and prescribed anti-inflammatory medication. Brown did not obtain medical treatment again until September 5, 2006 when she began seeing a chiropractor who treated her until October 13, 2006. Then, from November 29, 2006 until early January 2007, Brown was being treated by an orthopedist and a different chiropractor.
3. On April 4, 2007 Brown brought a Superior Court action against Stellini for negligence. Stellini conceded liability. The only issues left for trial were the nature, extent and cause of Brown's injuries, and the reasonableness of Brown's medical treatment. Brown sought to recover for her injuries and past medical expenses totaling $13,767.85. On August 13, 2008, the Superior Court entered a trial scheduling order, setting November 7, 2008 as the discovery deadline, and prohibiting the taking of trial depositions after December 15, 2008.
4. Stellini timely disclosed her only medical expert witness, Andrew Gelman, D.O., an orthopedic surgeon. Dr. Gelman, who had examined Brown, prepared a report reciting his conclusions. Dr. Gelman's report, which disclosed his expert testimony and its basis and was provided to Brown's counsel, pertinently opined:
Jennifer Brown alleges cervical dorsal spinal symptomatology dating back to a motor vehicle accident of May 1, 2006. She has had fragmented treatment by a number of providers as I have summarized above. As to that which has been documented and appears to be related to that which occurred on May 1, 2006, it would appear that Ms. Brown sustained a cervical dorsal sprain and strain injury. The record of Dr. Williams does not support a lower back injury having occurred on May 1, 2006. X-ray studies of September 2006 demonstrate some diminished disc height which would probably be physiologic and, in my opinion, not related to the accident of May 1, 2006.
As stated, Ms. Brown's treatment has been noted and fragmented with interruptions regarding care over the course of the past 2 years. Objectively, other than some apparent features of spasm as noted by providers over the past 2 years, her evaluations have been objectively unremarkable. Her subjective complaints with regards to the cervical spine are consistent with that which Dr. Williams documented on May 1, 2006.
The treatment provided, as stated, was fragmented. It is not particularly clear as to the absence of treatment between May 1, 2006 and September 5, 2006. There then also appears to be a further lapse of care through much of 2007 until .. [an] assessment on October 4, 2007. The records do not seem to support that which necessitated care per [one of the treating chiropractors]. It remains further unclear as to what brought Ms. Brown from [the first chiropractor to a subsequent doctor] which included further chiropractic treatment as well as office physical therapy.... The treatment provided in that particular time frame, some 6 months post injury, does not appear to have been an approach for which I believe was necessary.
Ms. Brown probably did require treatment as provided by Dr. Williams following the accident of May 1, 2006. Again it is unclear as to the then lapse of some 4 months after which Ms. Brown subsequently proceeded to treat. Whether or not the need for treatment was attributable to her job position in which she sits for extended periods of time, it is unclear, though it would not be unusual for her to have experienced cervical dorsal spinal difficulties attributable to sitting for 6-8 hours per day.
Ms. Brown's diagnosis is that of chronic cervical dorsal sprain/strain. In regards to that particular diagnosis, Ms. Brown's prognosis is very good. I believe that treatment has been exhausted and symptomatology as described subjectively is as noted. I do not believe that Ms. Brown is in need of further testing, physical therapy or chiropractic treatment and her complaints do not warrant surgical intervention....
5. On December 29, 2008, the parties deposed Dr. Gelman. At his deposition, Dr. Gelman opined, in essence, that Brown's injuries from the car accident had healed, and that her current injuries were the result of the sedentary nature of her job.
6. Brown moved in limine to exclude Dr. Gelman's causation testimony. Brown claimed that Gelman's opinion  that Brown's current injuries were caused by the nature of her job  was inadmissible, because that opinion was inconsistent with Dr. Gelman's prior report, submitted before the deadline for disclosing expert opinions. On January 5, 2009, the Superior Court denied that motion. The court reasoned that although Dr. Gelman's report was "a bit confusing," his deposition testimony on causation did not differ substantively from his prior report.[2] On January 7, 2009, Brown moved for reargument, which the Superior Court denied on the basis of its prior order. On January 8, 2009, the jury awarded Jennifer Brown $4,675 in damages, and her husband no ($0) damages. Brown appeals from the Superior Court's denial of her in limine motion to exclude Dr. Gelman's causation testimony.
7. In denying Brown's motion in limine, the trial court reasoned:
... the [c]ourt cannot see where Dr. Gelman's deposition testimony regarding "etiology," i.e., causation substantively differs from his letter. In other words, Dr. Gelman's letter significantly placed plaintiffs on notice of his opinion that Mrs. Brown's symptoms were job related even after taking into account her May 1, 2006, injury.
The [c]ourt grants that plaintiffs' complaint that Dr. Gelman's letter is a bit confusing. He seems to say that what Dr. Jane Williams treated Mrs. Brown was accident related but thereafter her symptoms were or are not. He also questions the need for most, if not all of the treatment she received from other providers subsequent to her treatment with Dr. Williams. When coupled with his concluding comments in his letter about her job and treatment, his deposition testimony, albeit clearer, is not prejudicially different.
This case does not have the stark contradiction of pre-trial deposition testimony and trial testimony found in Barrow v. Abramowicz [931 A.2d 424, 434-35 (Del. 2007)].[3]
8. Brown claims that the Superior Court abused its discretion by admitting Dr. Gelman's causation testimony into evidence, because that opinion testimony contradicted Gelman's pre-trial report. Accordingly (Brown argues), Dr. Gelman's inconsistent deposition testimony was inadmissible because it was first offered after the discovery deadline. Alternatively, Brown urges that even if Dr. Gelman's testimony did not contradict his pre-trial report, his causation opinion was nonetheless inadmissible because Dr. Gelman's pre-trial causation opinion was expressed as a mere possibility, not a medical probability.
9. Stellini responds that Dr. Gelman's causation testimony was properly admitted because his pre-trial report was not inconsistent with his deposition testimony. Therefore, it was not a new opinion offered after the discovery deadline. Moreover, even if Dr. Gelman's testimony was improperly admitted into evidence, any error was harmless, because other independent evidence would have created doubt in the jurors' minds about the extent of Brown's injuries and whether her treatments were medically necessary. That evidence alone would have resulted in Brown receiving less than the amount of damages she was seeking.
10. These contentions raise three issues. First, did Dr. Gelman's pre-trial report adequately disclose the substance of his deposition testimony? Second, did Dr. Gelman's pre-trial report indicate that his opinion was held to a medical degree of probability? Third, if Dr. Gelman's testimony was erroneously admitted, was that error harmless? Because we conclude that Dr. Gelman's causation testimony was properly admitted, it is unnecessary to reach the third issue (harmless error). We further conclude that Brown has waived the second issue, i.e., whether Dr. Gelman's pretrial report presents his expert opinion to a medical degree of probability. That argument was not raised until Brown's oral motion to reargue the Superior Court's denial of the motion in limine. Because Brown has not appealed from the initial denial of the reargument motion, the "medical probability" claim is not properly before us,[4] and therefore, we do not address that claim either.
11. In admitting Dr. Gelman's testimony, the Superior Court found that "the [c]ourt cannot see where Dr. Gelman's deposition testimony regarding `etiology,' i.e., causation, substantively differs from his [pre-trial report]." That is, Dr. Gelman's letter gave plaintiffs fair notice of his opinion that Mrs. Brown's symptoms were job related, even after taking into account her May 1, 2006 injury.[5]
12. We review a trial court's decision to admit expert testimony into evidence for abuse of discretion.[6] We review a trial court's findings of fact to determine if they are supported by the record and are the product of a logical and orderly reasoning process.[7]
13. Under Barrow v. Abramowicz[8] and Bush v. HMO of Delaware[9] a party must: (i) timely identify its medical experts, and (ii) timely disclose the expert's opinions and the bases for those opinions. Here, the inquiry is factual: was there a sufficient basis in the record for the Superior Court to conclude that Dr. Gelman's deposition testimony was consistent with his pre-trial report, and therefore, was timely disclosed?
14. To support her claim that Dr. Gelman's testimony was inconsistent with his pre-trial disclosure, Brown makes two related arguments. First, Brown contends that Dr. Gelman's pre-trial report, stating that Brown's "need for treatment was attributable to her job position," related only to the need for medical treatment of Brown's injuries, as distinguished from the cause of those injuries. Second (Brown argues), Dr. Gelman's testimony that Brown's injuries were caused by her job, was in "stark contradiction" with his pre-trial report that Brown's cervical dorsal sprain and strain injury "appears to be related to [the automobile accident] which occurred on May 1, 2006...."
15. Defendant Stellini responds that both arguments rest on a misinterpretation of Dr. Gelman's report. Stellini contends that Dr. Gelman made two distinct diagnoses in his pre-trial report: (i) "cervical sprain and strain," which he attributed to the accident, and (ii) "chronic cervical sprain and strain," which he attributed to Brown's job. Stellini contends the latter diagnosis ("chronic sprain and strain") is a medical term of art, that, when properly understood, clarifies Dr. Gelman's pre-trial report and establishes its consistency with his deposition testimony. Specifically, Stellini points to Dr. Gelman's deposition testimony that:
What I attribute to the accident is that  based primarily on Dr. Williams, that [Brown] sustained a cervical dorsal strain and sprain. It's my opinion that that's resolved. That has healed. That has gone away. The chronic utilization term here is attributable to her six to eight hours of sedentary secretarial work or work on a computer that causes the symptoms in the cervical dorsal spine that make it chronic. It's chronic because that's what she does on a daily basis. (emphasis added).
16. We agree that Dr. Gelman's testimony clarifies the difference between "chronic cervical sprain and strain," and "cervical sprain and strain." Specifically, the former (chronic sprain and strain) results from repeated stresses over time, whereas the latter (sprain and strain) results from a single incident. That distinction places the following excerpt from Dr. Gelman's report into context:
Ms. Brown probably did require treatment as provided by Dr. Williams following the accident of May 1, 2006. Again, it is unclear as to the then lapse of some 4 months after which Ms. Brown subsequently proceeded to treat. Whether or not the need for treatment was attributable to her job position in which she sits for extended periods of time, it is unclear, though it would not be unusual for her to have experienced cervical dorsal spinal difficulties attributable to sitting for 6-8 hours per day.
Ms. Brown's diagnosis is that of chronic cervical dorsal sprain/strain.
17. Because chronic sprain and strain involves repeated stress and injury over time, Dr. Gelman's pre-trial testimony that because of Brown's sedentary job "it would not be unusual for [Brown] to experience[] cervical spinal difficulties attributable to sitting for 6-8 hours per day," adequately and fairly disclosed his opinion that Brown's chronic sprain and strain was job-related.
18. Before the Superior Court and this Court, Brown argued that "[i]n her pre-trial disclosure, [Stellini] produced a report [opining] that [Brown] sustained a `chronic cervical dorsal sprain/strain' presumably as a result of the motor vehicle collision of May 1, 2006." This argument erroneously assumed that Dr. Gelman was attributing his diagnosis of chronic sprain and strain to the automobile accident. Chronic sprain and strain would require repeated stresses; it could not result from an isolated incident. The distinction between a "chronic" sprain and strain and an "ordinary" sprain and strain also disposes of Brown's argument that Dr. Gelman's deposition testimony (that Brown's injuries were work related) was in "stark contradiction" to his pre-trial report which opined that Brown's cervical sprain and strain "appears to be related to [the automobile accident] which occurred on May 1, 2006...."
19. Although Dr. Gelman's pre-trial report may have been (in the trial judge's words) "unclear," the Superior Court did not abuse its discretion in concluding that Dr. Gelman's testimony was not prejudicially different from his pre-trial report. The record reflects a meaningful distinction between a chronic sprain and strain and an ordinary sprain and strain. That distinction clarifies Dr. Gelman's pre-trial report, and establishes that his deposition testimony was consistent with that pre-trial report.
NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.
NOTES
[1] Ian Brown, Jennifer Brown's husband, is a party to her negligence action by reason of his loss of consortium claim. Jennifer Brown is referred to as "Brown."
[2] Brown v. Stellini, Del. Super., No. 07C-04-067, at 2 (Jan. 5, 2009) ("Superior Court Order").
[3] Id.
[4] See Supr. Ct. R. (8).
[5] Superior Court Order, supra, n.4.
[6] Green v. Alfred A.I. duPont Inst. of the Nemours Found., 759 A.2d 1060, 1063 (Del. 2000).
[7] Levitt v. Bouvier, 287 A.2d 671, 673 (Del. 1972).
[8] 931 A.2d 424, 433-34 (Del. 2007).
[9] 702 A.2d 921, 923 (Del. 1997).